# No. 23-1911

In the United States Court of Appeals
For the First Circuit

———————

**UNITED STATES OF AMERICA**,

Appellee,

-vs-

**JADNEL FLORES-NATER, a/k/a Potro**,

Defendant-Appellant.

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

———————

**DEFENDANT-APPELLANT'S BRIEF**

———————

Lucas Anderson
*Of Counsel*
Rothman, Schneider,
  Soloway & Stern, LLP
100 Lafayette Street, Ste.501
New York, New York 10013
(212) 571-5500

# Table of Contents

Table of Authorities .............................................................................................iii

Statement of Jurisdiction ........................................................................................1

Statement of Questions for Appellate Review ......................................................2

Statement of the Case .............................................................................................3

   I.     Initial District Court Proceedings ..................................................................3

    A.   The Indictments and the Charged Crimes ...................................................3

    B.   Flores-Nater's Guilty Plea ...........................................................................4

    C.   The PSR and the Initial Sentencing Proceeding ..........................................6

   II.    Flores-Nater's Initial Appeal to This Court.................................................8

   III.   The Resentencing Proceeding ...................................................................10

    A.   The Parties' Arguments .............................................................................10

    B.   The District Court's Proffered Explanation................................................11

Summary of the Argument ....................................................................................16

Argument................................................................................................................17

   I.  The District Court's newfound explanation for the imposed 360-month prison sentence, which is five years longer than the negotiated sentence recommended by the parties and 20 years longer than the advisory U.S. Sentencing Guidelines recommendation, was not grounded in an individualized assessment of Flores-Nater or his offense conduct. .............17

    A.   This Court has repeatedly confirmed that sentencing is an individualized process, and that sentencing courts may not "centrally" rely on community considerations to justify upwardly variant sentences. ................................18

    B.   The District Court committed procedural error by grounding its proffered explanation for Flores-Nater's sentence in arbitrary crime rate comparisons. ..............................................................................................21

i

   C.   Even if the District Court's invocation of comparative crime rates were connected to an individualized assessment of Flores-Nater or his offense conduct, the end result was substantively unreasonable.............................22

II.   The District Court's refusal to acknowledge Flores-Nater's mitigating arguments relating to his youth at the time of the charged crime amounts to an abuse of discretion....................................................................................25

Conclusion.....................................................................................................27

Certificate of Compliance..........................................................................28

Addendum ............................................................................... Add. 1-32

# Table of Authorities

## Cases

**Page(s)**

*Graham v. Florida,*
    560 U.S. 48 (2010) ...................................................................... 26

*Johnson v. Texas,*
    509 U.S. 350 (1993) .................................................................... 26

*Koon v. United States,*
    518 U.S. 81 (1996) ...................................................................... 20

*Miller v. Alabama,*
    567 U.S. 460 (2012) .................................................................... 26

*Rita v. United States,*
    551 U.S. 338 (2007) .................................................................... 25

*Roper v. Simmons,*
    543 U.S. 551 (2005) .................................................................... 26

*United States v. Colón-Cordero,*
    91 F.4th 41 (1st Cir. 2024) ................................................ *passim*

*United States v. Contreras-Delgado,*
    913 F.3d 232 (1st Cir. 2019) ...................................................... 23

*United States v. Flores-González,*
    34 F.4th 103 (1st Cir. 2022) ............................................. 13, 19-20

*United States v. Flores-González,*
    86 F.4th 399 (1st Cir. 2023) (en banc) ...................... 20-21, 22-23

*United States v. Flores-Machiote,*
    706 F.3d 16 (1st Cir. 2013) ...................................... 13, 19, 20, 22

*United States v. Flores-Nater,*
    62 F.4th 652 (1st Cir. 2023) ...................................... 9, 10, 18, 22

# Table of Authorities, Cont'd

## Cases

Page(s)

*United States v. Martin*,
520 F.3d 87 (1st Cir. 2008) ............................................................... 9-10, 18

*United States v. Montero-Montero*,
817 F.3d 35 (1st Cir. 2016) ......................................................................... 18

*United States v. Narvaez-Soto*,
773 F.3d 282 (1st Cir. 2014) ...................................................................... 13

*United States v. Rivera-Berríos*,
968 F.3d 130 (1st Cir. 2020) ................................................... 13, 17, 19, 20

*United States v. Rivera-González*,
776 F.3d 45 (1st Cir. 2015) ........................................................................ 19

*United States v. Robles-Pabon*,
892 F.3d 64 (1st Cir. 2018) ........................................................................ 21

*United States v. Santiago-Burgos*,
750 F.3d 19 (1st Cir. 2014) ................................................................... 15-16

*United States v. Santiago-Lozada*,
75 F.4th 285 (1st Cir. 2023) ....................................................................... 25

*United States v. Velez-Soto*,
804 F.3d 75 (1st Cir. 2015) ........................................................................ 17

*United States v. Wardlaw*,
576 F.2d 932 (1st Cir. 1978) ...................................................................... 25

## Statutes, Rules, and Sentencing Guidelines

18 U.S.C. § 924(c)(1)(A)(ii) ......................................................................... 3

18 U.S.C. § 924(c)(1)(A)(iii) ..................................................................... 3, 4

## Table of Authorities, Cont'd

### Statutes, Rules, and Sentencing Guidelines

**Page(s)**

18 U.S.C. § 924(j)(1) ........................................................... 3

18 U.S.C. § 1201(a)(1) ......................................................... 3

18 U.S.C. § 3231 .................................................................. 1

18 U.S.C. § 3553(a) ....................................................... *passim*

18 U.S.C. § 3742 .................................................................. 1

28 U.S.C. § 1291 .................................................................. 1

Fed. R. App. P. 4(b)(1)(A)(i) ............................................... 1

Fed. R. App. P. 32(a) ......................................................... 28

U.S.S.G. § 2K2.4(b) ............................................................. 5

# Statement of Jurisdiction

The United States District Court for the District of Puerto Rico had subject matter jurisdiction over this case pursuant to 18 U.S.C. § 3231. The initial judgment of conviction and sentence was entered on October 7, 2021. Appx. 44-50.[1] On March 20, 2023, this Court issued an opinion remanding the case to the District Court for resentencing. Appx. 51-62. Resentencing was held before the Honorable Francisco A. Besosa, and an amended judgment was entered on October 11, 2023. Add. 26-32. On October 17, 2023, defendant-appellant Jadnel Flores-Nater filed a timely notice of appeal, pursuant to Rule 4(b)(1)(A)(i) of the Federal Rules of Appellate Procedure. Appx. 63. Therefore, this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

---

[1] Citations to "Add." refer to the addendum attached hereto. Citations to "Appx." refer to the appendix, and citations to "Sealed Appx." refer to the sealed appendix, each filed under separate cover.

## <u>Statement of Questions for Appellate Review</u>

1.     Whether the District Court abused its discretion and committed procedural and substantive error by imposing a sentence of 360 months' imprisonment—60 months longer than the stipulated sentence recommended by the parties, which was itself 180 months longer than the sentence recommended by the U.S. Sentencing Guidelines—to account for the fact that the charged crime occurred in Puerto Rico, rather than some other jurisdiction within the First Circuit.

2.     Whether the District Court's failure to even acknowledge, let alone consider, Flores-Nater's principal mitigating argument at sentencing, relating to the fact that he was only 18 years and two months old at the time of his offense conduct, amounted to an abuse of discretion.

**Statement of the Case**

## I.      Initial District Court Proceedings

### A.      The Indictments and the Charged Crimes

The initial indictment filed in the District of Puerto Rico charged Jose Antonio Martinez-Santos with one count of kidnapping, in violation of 18 U.S.C. § 1201(a)(1), and one count of brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). Appx. 13-14. On March 14, 2019, the government filed a superseding indictment charging Martinez-Santos and three other individuals with one count of kidnapping, one count of discharging a firearm during and in relation to a crime of violence, in violation of § 924(c)(1)(A)(iii), and one count of causing murder, in violation of § 924(j)(1). Appx. 15-17. Nearly one and a half years later, on August 19, 2020, the government filed a second superseding indictment which omitted any mention of Martinez-Santos and added appellant Jadnel Flores-Nater and another individual as named defendants under each of the three charged counts. Appx. 18-20.

All of the offenses charged in the various indictments below relate to the June 8, 2018 kidnapping and murder of "WGE," which occurred two months after Flores-Nater's 18th birthday. *See* Sealed Appx. 8 (PSR ¶ 31). In a response brief filed in connection with Flores-Nater's previous appeal to this Court, the government summarized the undisputed facts of the charged crime:

3

WGE had threatened the members of the gang Flores belonged to and, thereafter, Flores's co-defendant Brian Díaz-Serrano received an order over the phone to murder WGE. After the phone call, Díaz met up with Flores and two other co-defendants, Roberto Meléndez-Hiraldo and Joshua Luyando-González, to pick up WGE. The three of them then told Flores "Llegó tu día / Your day has come" and gave him a .38 caliber revolver. The other co-defendants also had firearms.

 . . .

The men then told WGE to come outside and, when WGE complied, the men pointed guns at him and grabbed his arms. Flores and his three co-defendants then forced WGE into [a] Toyota Camry and drove him to Barrazas Ward in Carolina, Puerto Rico. On their way, the men picked up another co-defendant, Jairo Huertas-Mercado.

When the men arrived in Barrazas, Flores . . . shot WGE in the head. WGE then fell to the ground and, thereafter, Huertas continued to shoot him.[2] In total, WGE was shot 10 times to the head and 12 times to the upper body.

Case No. 21-1856, Doc. 117927754 (government response brief), at pp.3-4

(internal citations omitted).

### B.     Flores-Nater's Guilty Plea

On June 4, 2021, Flores-Nater signed a plea agreement through which he agreed to plead guilty to the § 924(c)(1)(A)(iii) crime charged under Count Two of the second superseding indictment. Appx. 21-31. The plea agreement contains a stipulated U.S. Sentencing Guidelines calculation that provides for an advisory

---

[2] Huertas-Mercado was the only codefendant who proceeded to trial. A jury found him not guilty on all three counts. 3:18 Cr. 516-4 (FAB), Dkt. 398.

sentence of 120 months' imprisonment—the statutory minimum—pursuant to U.S.S.G. § 2K2.4(b). Appx. 23. However, "after due consideration of the relevant factors enumerated in 18 U.S.C. § 3553(a)," the parties agreed they would each "request a sentence of 300 months of imprisonment." *Ibid.* Moreover, the parties "agree[d] that any recommendation by either party for a term of imprisonment below or above the stipulated sentence recommendation will constitute a material breach of the Plea Agreement." Appx. 23-24.

Additionally, in exchange for the government's promise to dismiss Counts One and Three at the time of sentencing, the plea agreement reflects that Flores-Nater agreed to waive his right to appeal "any aspect of the case's judgment and sentence" *if* the custodial sentence ultimately imposed "is 300 months or less." Appx. 24, 27. Finally, in a "stipulation of facts" appended to the plea agreement, Flores-Nater admitted that, "in the year 2018," he and other unnamed individuals brandished and discharged firearms "during and in relation to the kidnapping and murder of WGE," who "had been threatening members of the gang that [Flores-Nater] belonged to[.]" Appx. 30.

On June 24, 2021, Flores-Nater appeared for a remote court proceeding and pleaded guilty to Count Two. *See* Appx. 6 (Dkt. 254).

## C.    The PSR and the Initial Sentencing Proceeding

In advance of the scheduled sentencing proceeding, the U.S. Probation Office filed an amended presentence investigation report ["PSR"] on August 18, 2021. Sealed Appx. 1-13. Like the plea agreement, the PSR contains a recommended Sentencing Guidelines calculation yielding an advisory sentence of 120 months' imprisonment. Sealed Appx. 6, 10 (¶¶ 22, 48). With respect to Flores-Nater's acceptance of responsibility for his offense conduct, the PSR describes how, during his interview with the assigned Probation Officer, "[h]e stated that all actions have consequences, and [that] he has to face his mistakes. He expressed not knowing the victim and express[ed] that it must be a difficult time for his family." Sealed Appx. 5-6 (¶ 20).

The initial sentencing proceeding was held on October 7, 2021. As required under the plea agreement, both parties argued in favor of a 300-month custodial sentence. Appx. 34-35. When given an opportunity to address the relevant sentencing factors, Flores-Nater's trial counsel noted that co-defendants who had been involved in the charged kidnapping and murder received sentences that were more lenient than the requested sentence. Appx. 34. Otherwise, trial counsel rested on the defense's previously filed sentencing submission, which itself relied primarily on arguments relating to Flores-Nater's youth at the time of the charged

crime. Appx. 35. For example, the defense's written sentencing submission noted that:

> The Supreme Court of the United States has long held that juveniles are *per se* less culpable than adults. . . . While Flores-Nater is not a juvenile, we should consider that he was *barely* 18 years old at the time of the offense; his eighteenth birthday was just 2 months before the offense conduct.
> . . .
> Studies have shown that juvenile/teenage and adult minds are fundamentally different, especially in parts of the brain that involve control in behavior and conduct, as well as psychological development.
>  . . .
> As explained in the PSR, Flores-Nater was not the *brains behind the operation* in the instant case. Flores-Nater was merely another *soldier* following his codefendants' instructions. He was ordered and instructed by a codefendant to commit the charged crime. This is not to say that Flores-Nater is not responsible [for] his actions[.] . . . However, as explained in the PSR, *Flores-Nater was instructed by his codefendant and was influenced and moved by peer pressure into deciding to engage in said conduct.*
> . . .
> Certainly, Flores-Nater's conduct and actions cannot be said to belong to a mature, logical, and reasonable adult, deserving of the most severe punishment.

Sealed Appx. 16-18 (emphasis in the original).[3]

_____

[3] At the request of Flores-Nater's trial attorney, the defense's written sentencing submission was sealed on the District Court docket. *See* Appx. 7 (Dkt. Nos. 269 and 271). As such, it is not included in the public appendix on appeal.

The District Court rejected the parties' joint request and imposed a sentence of 360 months' imprisonment and five years of supervised release. Appx. 39. In providing an explanation for this sentence, the District Court summarized some of Flores-Nater's biographical history, noting that: "Mr. Flores is 21 years old. He does have a high school education. He was unemployed prior to his arrest for his offense and has a history of using marijuana and Percocet without a prescription." Appx. 37. The court then recounted some of the undisputed facts relating to the charged crime and noted that "[t]he parties agreed on a sentence of 300 months of imprisonment." Appx. 37-39. However, Judge Besosa determined that:

> [T]he sentence recommended by the parties does not reflect the seriousness of the offense, does not promote respect for the law, does not protect the public from further crimes by Mr. Flores, and does not address the issues of deterrence and punishment.

Appx. 39. Following the sentencing proceeding, the District Court filed a written judgment and a sealed statement of reasons. Appx. 44-50; Sealed Appx. 23-26.

## II.     Flores-Nater's Initial Appeal to This Court

On May 31, 2022, Flores-Nater filed a brief in this Court challenging the reasonableness of the sentence imposed. Case No. 21-1856, Doc. 117881734. Specifically, Flores-Nater argued that the District Court failed to account for his "age, immaturity, and vulnerability" at the time of the charged crime. *Id.*, at 12-17. Notwithstanding the plea agreement's unambiguous language precluding either party from "recommend[ing] . . . a term of imprisonment below or above the

stipulated sentence recommendation" of 300 months' imprisonment, Appx. 23-24, the government filed a response brief arguing that the "360-month sentence should be affirmed[.]" Case No. 21-1856, Doc. 117927754, at 12.

Flores-Nater's appeal was ultimately submitted without oral argument, and on March 20, 2023, this Court issued an opinion vacating Flores-Nater's sentence and remanding the case to the District Court for resentencing. Appx. 51-62 (*also available at United States v. Flores-Nater*, 62 F.4th 652 (1st Cir. 2023), *and* Case No. 21-1856, Doc. 117988019). Finding that Judge Besosa "failed to articulate a plausible rationale for the defendant's upwardly variant thirty-year sentence," this Court noted that:

> The only attempt at explanation made by the court was its statement that, in its view, the somewhat shorter sentence recommended by the parties did 'not reflect the seriousness of the offense, . . . promote respect for the law, . . . protect the public from further crimes by [the defendant], [or] . . . address the issues of deterrence and punishment.'
>
> That statement, in itself scarcely constitutes a plausible rationale sufficient to justify a steep upward variance. It is negative, not positive. More importantly, it is generic, not case-specific. At bottom, it simply rehearses – but does not apply – certain of the factors that Congress has instructed courts to consider in imposing sentences.

Appx. 52, 58; 62 F.4th at 653, 656. Significantly, this Court's opinion emphasized that "the rationale underlying [an] upward variance should 'be rooted either in the nature and circumstances of the offense or the characteristics of the offender.'" Appx. 60; 62 F.4th at 657 (quoting *United States v. Martin*, 520 F.3d 87, 91 (1st

Cir. 2008)). At the same time, this Court noted that if the District Court had "simply accepted the parties' joint recommendation, this would have been a different case." Appx. 61; 62 F.4th at 657.

### III.    The Resentencing Proceeding

#### A.    The Parties' Arguments

Flores-Nater appeared before Judge Besosa for resentencing on October 11, 2023. At the outset of the proceeding, Flores-Nater's trial counsel recalled that, "when we negotiated this plea agreement, we negotiated an upward variance that was once and a half the guideline range[.]" Add. 2. In addition, defense counsel noted that, in advance of the initial sentencing proceeding, "we had requested the Court to take into consideration certain factors, including that [Flores-Nater] was only . . . 18 years and two months old" at the time of the charged crime, and that "we made an analysis of the relevant 3553 factors" as they apply to "young offenders." Add. 3. Counsel also noted that Flores-Nater had been in jail for approximately six years, during which time he had obtained a GED, held a steady job in the kitchen of the McDowell FCI facility, and had not committed any disciplinary infractions. Add. 4. Finally, defense counsel reminded Judge Besosa that "[w]e have co-defendants in this case that are similarly situated" who received lower sentences. Add. 5.

The government, for its part, stated that it was again "recommending, pursuant to the plea [agreement], a sentence of 300 months," which represents "an upward variance [that] is supported by the nature and circumstances of the offense[.]" Add. 6.

## B.     The District Court's Proffered Explanation

After providing Flores-Nater an opportunity to speak on his own behalf, the District Court imposed the exact same sentence of 360 months' imprisonment and five years of supervised release. Add. 6-23. Responding to this Court's opinion and order remanding the case for resentencing, Judge Besosa first noted that Flores-Nater's prior notice of appeal "contend[ed] that the Court, quote, 'failed to consider his youth at the time of his offense," but that he had ultimately prevailed on appeal "not on the basis of his age." Add. 7. Then, with respect to this Court's directive that the District Court "articulate a plausible sentencing rationale," Judge Besosa argued that the "rationale for an upward variance may be inferred from the record." Add. 7, 10. Because it had previously "summarized the violent acts committed by Mr. Flores" on the record, the District Court complained that "the First Circuit Court of Appeals could, but did not, infer that the circumstances of this case warrant a sentence above the sentence recommended by the parties." Add.

10.[4] Further criticizing this Court's opinion, the District Court went so far as to state that "a reviewing court ought not to write at length merely to hear its own words resonate." Add. 10.

Having talked "at length" about its disagreements with this Court's opinion (without ever acknowledging the difference between an analysis of § 3553(a) factors and a mere summary of relevant facts), the District Court turned at last to "which specific facts of the case motivated [the sentencing] decision and why those facts led to [the] decision." Add. 10-11. However, even though he had *just* finished criticizing this Court for not "infer[ring]" that his rejection of the parties' stipulated 300-month sentence was based on "the violent acts committed by Mr. Flores," Add. 10, Judge Besosa proceeded to provide an *entirely different* explanation—one that had not been mentioned at any earlier point in the proceedings.

After summarizing the undisputed facts of the charged crime, all of which were discussed at the initial sentencing proceeding, Add. 11-14, Appx. 36-39, the District Court made note of its (undisputed)[5] determination that the Guideline

---

[4] This view of criminal sentencing review suggests that a District Court need not do *anything* more than adopt (or recite) the facts set forth in a PSR and announce the punishment to be imposed.

[5] The District Court itself recognized that the parties had already accounted for the fact that "the guideline sentence fails to encapsulate the full extent of Mr. Flores's criminal activity." Add. 15.

calculation applicable to the offense charged under Count Two "fails to account for the odious acts committed by Mr. Flores." Add. 14. But with respect to *the extent of* an upward variance that would constitute a reasonable sentence—the only contested issue at hand—the District Court stated that "[t]he high crime rate in Puerto Rico . . . underscores the inadequacy of the sentence recommended by the parties." Add. 15-16.

While arguing that "[t]he onslaught of criminal activity in San Juan and throughout this jurisdiction is an appropriate sentencing consideration," the District Court asserted that this Court "has, however, set forth shifting standards regarding the propriety of community-based considerations." Add. 16. Citing primarily to *United States v. Flores-Machiote*, 706 F.3d 16 (1st Cir. 2013), and *United States v. Narvaez-Soto*, 773 F.3d 282 (1st Cir. 2014), the District Court explained that "the First Circuit Court of Appeals continues to endorse community-based considerations in the sentencing context." Add. 16-17. However, the District Court also noted that, under this Court's precedents, "[c]iting the abysmal crime rate in Puerto Rico is not . . . sufficient by itself to trigger a presumption of reasonableness for an upward variance." Add. 17. Invoking this Court's opinion in *United States v. Rivera-Berríos*, 968 F.3d 130 (1st Cir. 2020), and the (later withdrawn) panel decision in *United States v. Flores-González*, 34 F.4th 103 (1st Cir. 2022), the District Court noted that this Court has reversed criminal sentences

in cases where the explanation provided by the sentencing court was "unmoored from any individual characteristics of either the offender or the offense of conviction." Add. 17-18.

Describing this Court's prior decisions as "constraints on the district court's discretion" to assign punishments based on selective crime rate comparisons, Add. 18, the District Court then proceeded to describe the differences in murder rates among jurisdictions within the First Circuit:

> Puerto Rico falls within the First Circuit, which includes Maine, Rhode Island, Massachusetts, and New Hampshire. The disparity in violent crime between Puerto Rico and these New England states is both astounding and tragic. From 2016 to 2018, the year Mr. Flores murdered WGE, the Puerto Rico homicide rates per 100,000 inhabitants were 20, 19.7, and 20 respectively. The corresponding rates of homicide in Maine, Rhode Island, Massachusetts, and New Hampshire ranged from 1.8 to 2.6 per 100,000 inhabitants.

Add. 20. In light of these differences, Judge Besosa argued that "[t]he number of murders among the First Circuit jurisdictions further demonstrates that the need to deter violent crime is greater in Puerto Rico than, for example, in Rhode Island and even Massachusetts." *Ibid*.

The District Court then *again* repeated some of the undisputed facts of the charged offense and declared that "[t]he statistics aid the Court in providing context, . . . highlighting the need for general and specific deterrence in an island plagued by crime." Add. 21-22. However, at no point did the court explain why it believed a comparison of Puerto Rico's crime rates to other, geographically distant

First Circuit jurisdictions had any particular relevance to Flores-Nater; why the co-defendants charged herein (including those who gave orders to Flores-Nater) did not receive similar sentences; or why the court's newfound explanation for the sentence imposed would not apply to every other person charged with committing a murder crime in Puerto Rico.

Finally, the District Court concluded with a statement that was substantively identical to the explanation it provided at the initial sentencing proceeding:

> The parties recommend a sentence of 300 months of imprisonment as to Count Two. The Court finds that the sentence recommended by the parties does not reflect the seriousness of the offense, does not promote respect for the law, does not protect the public from additional crimes by Mr. Flores, and does not address the issues of deterrence and punishment.

Add. 22. *Compare* Appx. 39. At no point did the District Court acknowledge Flores-Nater's arguments with respect to his youth at the time of the offense.

At the conclusion of the resentencing proceeding, the District Court falsely advised Flores-Nater that he had "waived [his] right to appeal [his] conviction and sentence," and that the waiver in his plea agreement "is enforceable." Add. 23. *Compare* Appx. 24, ¶ 10. *See also United States v. Santiago-Burgos*, 750 F.3d 19, 22-23 (1st Cir. 2014) (confirming that "even a knowing and voluntary appeal waiver only precludes appeals that fall within its scope.") (internal quotation omitted). Later that day, the District Court filed an amended judgment and a sealed "reason for amendment." Add. 26-32; Sealed Appx. 27.

## Summary of the Argument

By rejecting the parties' stipulated sentencing request and imposing an extra 60 months of imprisonment to account for the fact that the charged crime occured in Puerto Rico, the District Court abused its discretion and committed procedural and substantive errors warranting reversal. There is no prior decision of this Court that would permit such a drastic sentencing enhancement based on nothing more than the geographic location where a crime took place, and the District Court did not identify or analyze any relevant sentencing factor that would set Flores-Nater apart from every other individual charged with murder in the District of Puerto Rico. Moreover, the District Court's grudgingly provided and previously unmentioned explanation for the sentence imposed was based entirely on an arbitrary comparison of crime rates among First Circuit jurisdictions, and the record confirms that this reasoning had more to do with the District Court's quarrels with this Court than it did with the need for a just and defensible result in this particular case.

Finally, the District Court abused its discretion and committed a separate procedural or substantive error by refusing to even acknowledge, let alone provide a reasoned response to, Flores-Nater's detailed arguments regarding the fact that he was only 18 years and two months old at the time of the charged crime.

## Argument

**I.    The District Court's newfound explanation for the imposed 360-month prison sentence, which is five years longer than the negotiated sentence recommended by the parties and 20 years longer than the advisory U.S. Sentencing Guidelines recommendation, was not grounded in an individualized assessment of Flores-Nater or his offense conduct.**

This Court reviews sentencing issues for abuse of discretion, *Rivera-Berríos*, 968 F.3d at 133-34, assessing the reasonableness of the process afforded by the district court before addressing the substantive reasonableness of the sentence imposed, *United States v. Colón-Cordero*, 91 F.4th 41, 48 (1st Cir. 2024). At both stages of this "two-step framework," findings of fact are reviewed for clear error and questions of law are reviewed de novo. *Ibid. See also United States v. Velez-Soto*, 804 F.3d 75, 78 (1st Cir. 2015) ("An error of law underlying a sentencing court's decision constitutes an abuse of discretion.").[6]

---

[6] If, in response to this brief, the government chooses to advocate for the sentence imposed, and thereby "recommend[] . . . a term of imprisonment . . . above the stipulated sentence recommendation," such opposition will amount to a "material breach" of the agreement signed by counsel for the government on June 3, 2021. Appx. 23-24, 28. Moreover, if the government argues that the "plain error" standard should be applied, it will hopefully explain how Flores-Nater's trial counsel could have anticipated or responded to the explanation that was provided by the District Court, for the very first time, *after* the parties were given an opportunity to make and preserve their arguments at the resentencing proceeding.

**A.  This Court has repeatedly confirmed that sentencing is an individualized process, and that sentencing courts may not "centrally" rely on community considerations to justify upwardly variant sentences.**

This Court recently confirmed that, when a sentencing judge rejects the calculated Guidelines range—or varies upward from a negotiated joint sentencing request that itself represents a significant upward variance—"it must explain its reasons for doing so," and the "burden of explanation 'increases in proportion to the extent of [its] deviation[.]'" *Flores-Nater*, 62 F.4th at 655 (quoting *United States v. Montero-Montero*, 817 F.3d 35, 37 (1st Cir. 2016)). *See also id.*, at 655-56 ("The greater the variance, the more compelling the sentencing court's justification for the higher sentence must be.") (cleaned up). This explanation "should typically be rooted either in the nature and circumstances of the offense or the characteristics of the offender." *Martin*, 520 F.3d at 91. *See also Colón-Cordero*, 91 F.4th at 51 ("Of overarching importance in sentencing" is that the district court "must always conduct an 'individualized assessment' of the § 3553(a) factors—which include mitigating characteristics of the offender—based on the facts presented[.]"). This means that, particularly "[w]hen imposing a significant variance, a sentencing court must make clear which specific *facts of the case* motivated its decision and why those facts led to its decision." *Id.*, at 54 (internal quotation omitted) (emphases altered).

In *Flores-Machiote*, 706 F.3d at 24, this Court made clear that "[a] sentencing judge's resort to community-based characteristics does not relieve him or her of the obligation to ground sentencing determinations in case-specific factors," and that "[i]t is possible for a sentencing judge to focus too much on the community and too little on the individual." Subsequently, in *Rivera-Berríos*, this Court confirmed that a sentencing judge's "appraisal of community-based considerations does not relieve its obligation to ground its sentencing determination in individual factors related to the offender and the offense.'" 968 F.3d at 136 (quoting *United States v. Rivera-González*, 776 F.3d 45, 50 (1st Cir. 2015)).

More recently, in *Flores-González*, a panel of this Court reviewed Judge Besosa's imposition of an upwardly variant sentence after finding, as he did in this case, that because of unusually high crime rates in Puerto Rico, "neither party's suggested sentence 'reflects the seriousness of the offense, promotes respect for the law, protects the public from further crimes by . . . [the appellant],' or 'addres[es] the issues of deterrence and punishment[.]'" 34 F.4th at 108. *Compare* Add. 22. While confirming that sentencing judges may "discretionally vary sentences . . . by *categorically* disagreeing with the suggested guidelines range . . . on a basis applicable to *all* defendants . . . or by making an *individualized* appraisal of the § 3553(a) factors—*i.e.*, by considering the *particular* characteristics of the

defendant and the *particular* offense conduct," the *Flores-González* panel emphasized that sentencing courts "act arbitrarily and capriciously by varying upward . . . based solely on the characteristics of the broader community where the defendant's conduct took place." *Id.*, at 111, 115 (emphasis in the original).

 *Flores-González* was subsequently reheard and decided by an "equally divided en banc court." 86 F.4th 399, 407 (1st Cir. 2023), *petition for cert. filed* April 8, 2024 (No. 23-7165). In an opinion on behalf of himself and Judges Lynch and Gelpí, Judge Kayatta argued that *Flores-Machiote*, and *Rivera-Berrios*—which "remain controlling precedent"—had "effectively eliminate[d] any ability" of sentencing courts to impose upwardly variant sentences based on the geographic area in which an offense occurred. *Id.*, at 409, 413. Judge Thompson, writing for herself and Judges Barron and Montecalvo, issued a separate opinion which emphasized the notion that "fair sentencing is *individualized* sentencing," *id.*, at 413 (internal quotation omitted), and that "a sentence must reflect an individualized assessment of the § 3553(a) factors through the lens of the particular defendant's case," *id.*, at 425.[7] While noting that this Court has previously affirmed

---

[7] This focus on the individualized nature of criminal sentencing stems from well-established binding precedent. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").

upwardly variant sentences based in part on "community-related factors," Judge Thompson pointed out that the sentencing judges in those cases "*did not* centrally rely on community considerations." *Id.*, at 427-28 (quoting *United States v. Robles-Pabon*, 892 F.3d 64, 66 (1st Cir. 2018)) (emphasis in *Flores-González*). On the other hand, Judge Thompson noted, this Court has repeatedly "found error" where "judges plainly based their rulings on community-centered concerns rather than on individualized assessments of [a] defendant's circumstances." *Id.*, at 428-29.

### B. The District Court committed procedural error by grounding its proffered explanation for Flores-Nater's sentence in arbitrary crime rate comparisons.

While the line separating reasonable and unreasonable considerations of "community-related factors" in connection with federal criminal sentencing proceedings has yet to be drawn with precision, the resentencing transcript in this case makes clear that annual murder rates in Puerto Rico, as they specifically compare to other, geographically distant jurisdictions within the First Circuit, were the central component of the District Court's proffered explanation for its decision to reject the parties' joint sentencing request. Add. 20-22. As such, under each of the two competing views expressed in *Flores-González*, 86 F.4th 399, the District Court abused its discretion and committed a clear procedural error.

Although Judge Besosa specifically cited to this Court's prior (binding) decision in *Flores-Machiote*, Add. 19, he then presented an explanation for Flores-Nater's sentence that was not "ground[ed] . . . in case-specific factors" and relied *far* "too much on the community and too little on the individual." 706 F.3d at 24. Indeed, the reasoning that was ultimately supplied (after a good deal of protest) at resentencing would apply with equal force to *any* defendant charged with a murder offense committed within the District of Puerto Rico. *See Flores-González*, 86 F.4th at 443 (Judge Thompson opinion) (noting that, under "pre-existing and still-binding precedent," sentencing judges "cannot give so little weight to the individualized circumstances of how the defendant committed the crime that they (in the name of 'general deterrence') treat *every* commission of it as requiring an upward variance."). As such, the District Court's explanation for the sentence imposed—which was never hinted at in any of the prior proceedings—did not amount to an "individualized assessment of the § 3553(a) factors," *Colón-Cordero*, 91 F.4th at 51, and was not "rooted either in the nature and circumstances of the offense or the characteristics of the offender," *Flores-Nater*, 62 F.4th at 656.

  **C.** **Even if the District Court's invocation of comparative crime rates were connected to an individualized assessment of Flores-Nater or his offense conduct, the end result was substantively unreasonable.**

Judge Kayatta's opinion in *Flores-González* confirms that "a variance imposed because of community characteristics must . . . meet the requirements of

substantive reasonableness," 86 F.4th at 409, and therefore "must have both 'a plausible sentencing rationale and a defensible result,'" *id.*, at 412 (quoting *United States v. Contreras-Delgado*, 913 F.3d 232, 243 (1st Cir. 2019)). In this case, even if the District Court had done something more than recount undisputed facts and intersperse those recitations with selective crime statistics—if it had "ma[d]e clear which specific *facts of the case* motivated its decision," *Colón-Cordero*, 91 F.4th at 54 (emphasis altered)—the very premises underlying its invocation of comparative crime statistics was itself implausible and illogical.

Upon reviewing the resentencing transcript, one question instantly jumps to mind: Why, if this sentence is affirmed, couldn't a defendant in a federal murder case charged elsewhere in the First Circuit seek (and obtain) a significant *downward* variance based on the fact that his crime was not committed in Puerto Rico? After all, if the comparative rates of murder crimes "among First Circuit jurisdictions," Add. 20, is relevant to the formulation of substantively reasonable sentences, and if the relative severity of a punishment is still (despite all empirical evidence to the contrary) accepted as an appropriate reflection of the extent of deterrence warranted in each particular case, then it stands to reason that if Judge Besosa were to impose sentence on a defendant charged with committing the exact same crime in Rhode Island, Maine, Massachusetts, or New Hampshire, he would *sua sponte* vary downward from the applicable Guidelines range or stipulated

sentence by approximately 60 months. Of course, such a result would never stand, and the government would never attempt to defend it on appeal.

Another problem with the District Court's logic lies in the fact that geographic areas can be divided up and selectively compared in any manner that supports the outcome preferred by a party or a sentencing court. For example, if an offense occurs in a high-crime neighborhood in Providence, the government could cite this case and argue that an upward variance is warranted, while the defendant could point to another neighborhood, perhaps in Boston, that has an even higher crime rate to argue that location-based deterrence concerns are not relevant to his case. The manifest absurdity of these types of arguments, and the equal protection problems that would arise if they were to be widely employed and upheld—with the law consistently finding defendants who are unlucky enough to live in high-crime locations to be in need of extra punishment—become clear even before one considers the sheer arbitrariness of comparing crime rates in one location to jurisdictions thousands of miles away, as Judge Besosa did in this case.

Judges should punish people for the crimes they commit, not for where they live. The District Court here made it clear that its primary focus during Flores-Nater's resentencing proceeding was to criticize and argue with this Court, both with respect to its prior decision in this case and with respect to its rulings in other, similar cases. *See supra*, pp.11-12, 13-14. In doing so, the District Court

improperly used Flores-Nater as a tool to advance those arguments and employed a facially implausible rationale to arrive at an indefensible, substantively unreasonable, result.

## II. The District Court's refusal to acknowledge Flores-Nater's mitigating arguments relating to his youth at the time of the charged crime amounts to an abuse of discretion.

In *Colón-Cordero*, this Court recently reversed a sentence imposed by Judge Besosa due to his "failure to consider expressly [the appellant's] intellectual disability as a mitigating characteristic." 91 F.4th at 52. In doing so, this Court confirmed that "sentencing courts must say enough to show an appellate court they 'considered the parties' arguments and ha[d] a reasonable basis for exercising [their] own legal decisionmaking authority.'" *Id.*, at 51 (quoting *Rita v. United States*, 551 U.S. 338, 356 (2007)). *See also United States v. Wardlaw*, 576 F.2d 932, 939 (1st Cir. 1978) (reversing where the district court "entirely put to one side such mitigating factors as defendants' youth, positive presentence reports, and lack of criminal records[.]").[8]

---

[8] "Generally speaking, it is not abundantly clear whether failure to consider mitigating factors goes to the procedural or substantive reasonableness of a sentence." *United States v. Santiago-Lozada*, 75 F.4th 285, 295 n.11 (1st Cir. 2023). *See also Colón-Cordero*, 91 F.4th at 50 n.4. At the risk of adding unnecessary complexity to an otherwise straightforward argument with respect to this point on appeal, the undersigned contends that a sentencing court's failure to even acknowledge a relevant mitigating factor (as here) amounts to a reversible procedural error, whereas a sentencing decision that accounts for such a factor to

In this case, even though they were highlighted in Flores-Nater's written sentencing submission, Sealed Appx. 16-18, and even though they were again referred to by Flores-Nater's trial counsel at the beginning of the resentencing proceeding, Add. 2-4, the District Court declined to even acknowledge the fact that Flores-Nater submitted detailed mitigating arguments relating to the fact that he was only 18 years and two months old when his codefendants (who either received lower sentences than he did or were exonerated at trial) gave him orders to participate in the charged crime.[9] Moreover, while it does not affect the question of whether this failure amounted to a reversible error under *Colón-Cordero*, it is worth noting that Judge Besosa's refusal to address Flores-Nater's "principally highlighted argument below," 91 F.4th at 52, was all the more conspicuous in light of the fact that he *did*, in criticizing the basis for this Court's opinion remanding

---

*some* extent, but still reaches an untenable result, would be properly classified as a substantive error.

[9] "There is no dispute that a defendant's youth is a relevant mitigating circumstance." *Johnson v. Texas*, 509 U.S. 350, 367 (1993). "Because juveniles have diminished culpability and greater prospects for reform . . . , 'they are less deserving of the most severe punishments.'" *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (quoting *Graham v. Florida*, 560 U.S. 48, 68 (2010)). *See also Roper v. Simmons*, 543 U.S. 551, 570 (2005) ("The susceptibility of juveniles to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of an adult," thus "render[ing] suspect any conclusion that a juvenile falls among the worst offenders."). Moreover, while Flores-Nater's crime occurred two months after his 18th birthday, the Supreme Court has specifically noted that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Roper*, 453 U.S. at 574.

the case for resentencing, explicitly note that Flores-Nater's prior notice of appeal complained of a "fail[ure] to consider his youth at the time of his offense." Add. 7. Even if there were reason to think the District Court's lack of consideration with respect to the principal argument submitted by the only party who presented arguments at either of the sentencing proceedings was a mere oversight, "its failure to mention, let alone engage with," Flores-Nater's youth "as a mitigating characteristic . . . smacks of a failure to make an individualized assessment," and therefore amounts to an independently sufficient grounds for reversal. *Colón-Cordero*, 91 F.4th at 54.

## Conclusion

The case should be remanded for resentencing.


Dated:  April 29, 2024          /s/_____
        New York, New York      Lucas Anderson
                                *Of Counsel*
                                Rothman, Schneider,
                                    Soloway & Stern, LLP
                                100 Lafayette Street, Ste. 501
                                New York, New York 10013
                                (212) 571-5500

## Certificate of Compliance

In compliance with Rule 32(a) of the Federal Rules of Appellate Procedure, this brief contains 6,249 words, including footnotes and headings, and is printed in proportionally spaced 14-point Times New Roman typeface.

Dated:     April 29, 2024           /s/_____
            New York, New York     Lucas Anderson
                                       *Of Counsel*
                                       Rothman, Schneider,
                                             Soloway & Stern, LLP
                                       100 Lafayette Street, Ste. 501
                                       New York, New York 10013
                                       (212) 571-5500

**<u>Addendum</u>**

**Table of Contents**

**Pages**

Transcript of Resentencing Hearing, October 11, 2023 .................................... 1-25

Amended Judgment in a Criminal Case, October 11, 2023 ............................ 26-32

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO


UNITED STATES OF AMERICA,            )
                                     )
                Plaintiff,           )
                                     )
vs.                                  )Case No: 18-516-FAB
                                     )
JADNEL FLORES NATER,                 )
                                     )
                Defendant.           )

_____

TRANSCRIPT OF RE-SENTENCING HEARING
HELD BEFORE
THE HONORABLE JUDGE FRANCISCO A. BESOSA
Wednesday, October 11, 2023

_____

A P P E A R A N C E S

For the Plaintiff:

    VICTOR ACEVEDO, AUSA


For the Defendant:

    JASON GONZALEZ, ESQ.

1           (PROCEEDINGS COMMENCED AT 10:50 A.M.)

2

3           DEPUTY CLERK:  Criminal Case Number 18-516, the

4    United States of America versus Jadnel Flores-Nater for

5    re-sentencing.  Appearing on behalf of the Government, AUSA

6    Victor Acevedo.  And on behalf of the defendant, Attorney

7    Jason Gonzalez.  The defendant --

8           THE COURT:  Is not here.

9           DEPUTY CLERK:  Criminal Case Number 18-516, the

10   United States of America versus Jadnel Flores-Nater for

11   re-sentencing.  Appearing on behalf of the Government, AUSA

12   Victor Acevedo.  And on behalf of the defendant, Attorney

13   Jason Gonzalez.  The defendant is now present in court, and

14   will be assisted by the court interpreter.

15          MR. ACEVEDO:  The United States is ready, Your

16   Honor.

17          THE COURT:  Mr. Gonzalez?

18          MR. GONZALEZ:  Good morning, Your Honor.  We are

19   ready to proceed.

20          THE COURT:  Is there anything you would like to

21   say on behalf of Mr. Flores before I pronounce sentence?

22          MR. GONZALEZ:  Yes, Your Honor.  In this case, the

23   Court of Appeals was in agreement with us in the sense that

24   when we negotiated this plea agreement, we negotiated an

25   upward variance that was once and a half the guideline range

1     that was supposed to apply to Mr. Flores-Nater.  When that

2     happened, we had requested the Court to take into

3     consideration certain factors, including that he was only

4     18 years old, recently -- he had just recently had a

5     birthday when that happened.  He was 18 years and two months

6     old when these issues happened.

7             From reviewing the presentence report, the Court

8     can see that this is one of those cases in which this

9     individual, Mr. Flores-Nater, he is one of the flaws in the

10    system, in the school system.  We lost him at a very young

11    age.  He did not have a father figure.  The father figure

12    that he had was a stepfather, father of his siblings, and he

13    got lost in the use of drugs from a very young age.  And

14    this was one of those reasons why he spiralled out of

15    control.

16            Now, in our sentencing memorandum filed in docket

17    268, we made an analysis of the relevant 3553 factors

18    regarding young offenders, and we are just asking the Court

19    to take into consideration those factors and give him the

20    opportunity to take this opportunity that he is going to be

21    in jail for a very, very long time, from such a young age,

22    that he will literally not have a life.  And I explain

23    myself as this as not having a life.  By the time that he

24    comes out, all of his productive working years will have

25    expired.  He will have the opportunity to spend his time in

1     jail with all the limitations that jail has.

2         Now, the sentence that the Court imposed in the

3     first sentencing hearing was one that was higher than what

4     we had requested. And we also in Document 268 expressed

5     with some case law that determines that deterrence is not

6     found by the defendant by a longer sentence. It only gives

7     them a date in which they will be released from jail. And

8     literally, it's like in the movies; they just start making a

9     "tachando". They just start blocking out in the calendar

10     the days that pass until they literally come out. But we

11     are requesting that the Court grant him the opportunity to

12     take psychological and psychiatric evaluations, treatment.

13     We are asking for vocational treatment. We are asking that

14     he be allowed to go to -- take English as a second language.

15         In the years -- he's been in jail for about six

16     years now. He has completed the case -- the money

17     management course. He finally got his GED. He's been

18     working in the kitchen in McDowell, West Virginia

19     correctional facility where he has been serving his term,

20     which is a medium disciplinary correctional facility, from

21     4:00 in the morning until noon for eight months, until he

22     was transferred back to Puerto Rico. While he has been in

23     jail, he has no chats, no administrative procedures. From

24     2018 to 2020, when the case was in -- it was starting, he

25     was detained in Humacao for a juvenile sentence that he was

1   still complying with.

2       Now, one of the things that he told me that has

3   been beneficial for him was that his relationship with his

4   family, his mother, his brothers, his daughter, including

5   the family of his daughter, has greatly improved.  In court

6   today we have his mother and other family members that have

7   shown their support for him for all these years that he's

8   been in jail.

9       Now, we would like the Court to take into

10  consideration also the fact that he has been in jail since

11  he's been 18 years old.  He will not be out until a time in

12  which he will be over 40 years old.  We have co-defendants

13  in this case that are similarly situated, that the Court

14  sentenced them to 25 years.  And in those -- that

15  co-defendant, his plea agreement was 17-and-a-half years,

16  and the Court gave him an upward variance of 25 years.  We

17  believe that in that case, the defendant did not have any

18  upward variances to which he had agreed upon.

19      We would like the Court to take into consideration

20  the First Circuit Court's opinion in the sense that

21  Mr. Jadnel Flores-Nater, knowing the seriousness of the

22  facts of his case, of his responsibility, of his involvement

23  in the case, he accepted a sentence which is two-and-a-half

24  times the sentence -- the mandatory minimum in this case --

25  that he accepted a sentence which is two-and-a-half times

1    the mandatory minimum sentence or guideline sentence in this

2    case.  That is something that the prosecutor and I

3    negotiated extensively for the time that this case -- we

4    worked on it, and we believe, Your Honor, that the

5    sentencing memorandum, the presentence report, and the

6    sentence from the Court of Appeals agrees upon, that this is

7    a -- the sentence that we have requested from the Court,

8    that we have recommended with the Government, is a sentence

9    that is just and not more than necessary, given the

10   particular facts of Mr. Flores-Nater.  Submitted, Your

11   Honor.

12            THE COURT:  Mr. Acevedo, please.

13            MR. ACEVEDO:  Yes, Your Honor.  United States is

14   recommending, pursuant to the plea, a sentence of

15   300 months, Your Honor.  That sentence is an upward

16   variance, which is supported by the nature and circumstances

17   of the offense, which include that the defendant

18   participated in the kidnapping of the victim and in the

19   murder of the victim.

20            THE COURT:  Thank you.

21            Mr. Flores, is there anything you would like to

22   say?

23            THE DEFENDANT:  I am here today, together with my

24   attorney, Jason, my sister and my mother, too.  I would like

25   to apologize to yourself, Judge, the Government, the U.S.,

1    and to my mom and my family.  Thanks to my mom and my sister

2    for always providing me support.  And that would be all I

3    want to say.  Thank you.

4    THE COURT:  On June 24, 2021, the defendant,

5    Jadnel Flores-Nater, pled guilty to Count Two of the second

6    superseding indictment in Criminal Case Number 18-516,

7    charging him with violating Title 18, United States Code

8    Section 924(c)(1)(A)(iii) and Section 2, which is a Class A

9    felony.  This statute prohibits the discharge of a firearm

10   during and in relation to a crime of violence.

11   On October 7, 2021, this Court sentenced Defendant

12   Flores to a term of 360 months of imprisonment and a

13   supervised release term of five years.  Mr. Flores filed a

14   notice of appeal the following day, contending that the

15   Court, quote, "failed to consider his youth at the time of

16   his offense."  Mr. Flores prevailed before the First Circuit

17   Court of Appeals, but not on the basis of his age.

18   On March 20, 2023, the First Circuit Court of

19   Appeals held that this Court failed to, quote, "articulate a

20   plausible sentencing rationale."  Today the Court provides

21   ample, as the Court of Appeals said, "spoor for the

22   cognoscenti" to support its 360-month sentence.

23   The November 1, 2021, edition of the Sentencing

24   Guidelines Manual has been used to calculate the guideline

25   adjustments pursuant to the provisions of Guideline

1    Section 1B1.11(a).  The guideline sentence for Count Two of

2    the second superseding indictment is the term of

3    imprisonment required by statute, not less than 120 months

4    of imprisonment, pursuant to Sentencing Guideline

5    Section 2K2.4(b), followed by a supervised release term of

6    not more than five years and/or a $250,000 fine.

7         Chapter 4 of the Sentencing Guidelines Manual is

8    not applicable.  If Chapter 4 would have applied, however,

9    Mr. Flores's prior juvenile adjudications and adult

10   convictions would have accrued six criminal history points,

11   which would have established a Criminal History Category of

12   III pursuant to the sentencing table in Sentencing

13   Guidelines Manual Chapter 5, Part A.

14        The Court has reviewed the guideline calculations

15   and finds that the presentence investigation report has

16   adequately applied the guideline computations, and that it

17   satisfactorily reflects the components of Mr. Flores's

18   offense by considering their nature and circumstances.  The

19   Court has also considered the other sentencing factors set

20   forth in Title 18, United States Code Section 3553(a), the

21   presentence investigation report, the plea agreement, the

22   sentencing memorandum filed on Mr. Flores's behalf, the

23   Court of Appeals opinion, trial testimony by co-defendant

24   Luyando, arguments by counsel and the prosecutor, and

25   Mr. Flores's allocution.

1       Mr. Flores has been previously adjudicated of

2   unlawful weapons and ammunition possession, resisting

3   arrest, and obstructing or delaying justice in Criminal Case

4   Numbers J17-001, 002, and 003, and 010 by the Commonwealth

5   Superior Court, Carolina Juvenile Affairs Division.  He was

6   also convicted as an adult of conspiracy to possess

7   controlled substances in Criminal Number FSC2018G0123, also

8   by the Commonwealth Superior Court, Carolina Division.

9       Mr. Flores is 23 years old.  He graduated from

10  high school.  He has no history of employment, and has a

11  history of using marijuana and Percocet without a

12  prescription.  His father passed away in 2003.  His mother,

13  his aunt, and his stepfather raised Mr. Flores and his three

14  maternal siblings.  He has no history of mental or emotional

15  problems and no history of treatment for those problems.

16      The First Circuit Court of Appeals held that this

17  Court "offered no case-specific rationale to justify a

18  variance of so great a magnitude."  A sentencing court must,

19  when imposing a significant variance, which in this case was

20  60 months over the variant sentence recommended by the

21  parties, specify which facts of the case motivated its

22  decision and why those facts led to its decision to vary

23  upward from the sentence recommended by the parties.

24      A sentence outside the guideline range does not

25  come to the reviewing court with a presumption of

1    unreasonableness.  Even when the district court imposes a

2    variant sentence, the First Circuit Court of Appeals affords

3    due deference to the district court's decision that the

4    Section 3553(a) factors, on a whole, justify the extent of

5    the variance.  The sentencing court's rationale for an

6    upward variance may be inferred from the record.  When lower

7    courts have supportably found the facts, applied the

8    appropriate legal standards, articulated their reasoning

9    clearly, and reached a correct result, a reviewing court

10   ought not to write at length merely to hear its own words

11   resonate.

12          The Court summarized the violent acts committed by

13   Mr. Flores at the 2021 sentencing hearing, detailing the

14   depravity displayed by the defendants in this criminal

15   action.  In fact, the First Circuit Court of Appeals

16   recognized that this case, quote, "is obviously more

17   horrific than the heartland offense falling within the

18   applicable guideline," unquote.  Based on this observation,

19   the First Circuit Court of Appeals could, quote, "perhaps

20   infer, notwithstanding the opacity of the sentence, what

21   sparked the perceived need for an upward variance," unquote.

22   Essentially, the First Circuit Court of Appeals could, but

23   did not, infer that the circumstances in this case warrant a

24   sentence above the sentence recommended by the parties.

25   Rather, it mandated that this Court, quote, "must make clear

which specific facts of the case motivated its decision and why those facts led it to its decision," unquote.

The following facts motivate this Court to impose a sentence that is just and appropriate in accordance with the Section 3553 factors. These facts convey the nature and circumstances of the offense and the characteristics of the offender.

Mr. Flores and his co-defendants kidnapped an unsuspecting individual, known by his initials WGE, by force and intimidation to commit murder, the most serious and irrevocable crime. On June 8, 2018, Mr. Flores, Joshua Luyando-Gonzalez, Roberto Melendez-Hiraldo, and Brian Diaz-Serrano drove to a public housing project in Luquillo, Puerto Rico in a Toyota Camry and a Toyota Rav4.

Defendants Huertas-Mercado and Pizarro-Mercado stood trial in September of 2022. Defendant Luyando testified as a cooperating witness. The facts set forth at this sentencing hearing derive, in part, on Mr. Luyando's trial testimony. This Court possesses considerable discretion in deciding what evidence is reliable enough to be considered for sentencing purposes. Generally, there is no limitation on the information which a Court may consider in sentencing, other than that the information bear a sufficient indicia of reliability to support its probable accuracy, and evidence not normally admissible under the

Rules of Evidence at trial may be considered.  The trial testimony proffered by Mr. Luyando bears a significant -- a sufficient indicia of reliability, providing this Court a credible account of the June 8, 2018, murder.

A person referred to as "WGE," a rival gang member, lived at the public housing project.  WGE was 20 years old, just one year older than Mr. Flores, at the time of the offense.  The defendants each carried a firearm, ready and prepared to commit murder.  Mr. Flores possessed a .38 caliber revolver, which had been given to him by two of his co-defendants.  This firearm served a specific predetermined purpose:  Mr. Flores intended to murder WGE. In fact, when his co-defendants gave Mr. Flores the revolver, they stated the following phrase to him:  Quote, "Your day has come," articulating an expectation that Mr. Flores perform a criminal act, to murder WGE.

The record contains a factual discrepancy.  First, the presentence report for Mr. Flores provides that his co-defendants told him, "Your day has come."  The First Circuit Court of Appeals has noted, however, that Mr. Flores told WGE, "Your day has come," immediately before murdering him.  To quote United States versus Melendez-Hiraldo, "Just before WGE was murdered, the co-defendant who fired the first shot said, 'Llego tu dia'"; in other words, "Your day has come."  This factual discrepancy is immaterial to the

Court's sentencing analysis.  The statements made by Mr. Flores do not detract from the undisputed fact that he murdered WGE in cold blood.

The defendants approached WGE's apartment with weapons drawn.  Mr. Melendez and Mr. Diaz knocked on the front door, demanding that WGE step outside.  WGE complied.  According to Mr. Luyando, Mr. Flores, quote, "got up real close to WGE from the back and put the revolver to his back and told him not to run because he'd shoot him."  The defendants then placed WGE inside the Toyota Camry, driving from the public housing project to a dark place in the countryside.  They briefly stopped, however, to pick up Mr. Huertas-Mercado.

After arriving at their destination, the defendants ordered WGE to exit the Toyota Camry.  Mr. Flores then exited the vehicle and fired the first shot with the revolver he had been given previously, lodging a bullet inside WGE's head, killing him.  After WGE fell to the floor, at least one of the co-defendants continued to shoot.  Mr. Flores and Mr. Melendez-Hiraldo subsequently burned the Toyota Camry, destroying the vehicle used to transport WGE to the execution site.

The forensic investigators discovered WGE in the supine position, riddled with bullets and left to deteriorate in the Puerto Rico heat.  WGE sustained 22

bullet wounds to his head, arms, back, and gluteus. It is
not clear if Mr. Flores continued to shoot after he first
shot WGE in the head. One can easily infer, however, that
as the first shooter, he continued to shoot his revolver,
and contributed to the ten shots WGE received to his head,
shots that obliterated his face. Indeed, Mr. Luyando states
that Mr. Flores shot WGE many times while he was on the
ground, possibly firing all the rounds.

Mr. Flores pled guilty to Count Two of the second
superseding indictment, conceding that he discharged a
firearm during and in relation to a crime of violence. This
count fails to account for the odious acts committed by
Mr. Flores. As the Court of Appeals has stated, "Acts ought
to have consequences, and heinous acts ought to have severe
consequences." Indeed, the First Circuit Court of Appeals
has recently affirmed an upward variant life sentence based
in part on the, quote, "callousness and brutality," unquote,
of the offense in which the victim was killed.

The guideline sentence for Count Two of the second
superseding indictment is the minimum term of imprisonment
required by statute regardless of the underlying crime or
individual characteristics of the defendant. The underlying
crime of violence for Count Two is kidnapping resulting in
death. The First Circuit Court of Appeals has held,
however, that, quote, "To be convicted under Title 18,

United States Code Section 924(c)(1)(A)(iii), a death need
not result from the crime of violence."  Accordingly, the
fact that the crime of violence resulted in death here was
not accounted for anywhere in the guideline calculation
because, pursuant to Sentencing Guideline Section 2K2.4(b),
the guidelines sentence was the minimum term of imprisonment
required by statute.  Consequently, the guideline sentence
is inadequate because it fails to reflect the seriousness of
Mr. Flores's offense.

The Court dismissed Counts One and Three after
Mr. Flores pled guilty to Count Two.  This dismissal
eliminated the prospect of life imprisonment.  The plea
agreement recommends that this Court impose an upward
variant sentence of 300 months of imprisonment.  This
recommendation acknowledges that the guideline sentence
fails to encapsulate the full extent of Mr. Flores's
criminal activity.  A sentencing court may, quote, "consider
the seriousness of the other charges in the indictment which
the parties have agreed to dismiss pursuant to the plea
agreement," unquote.  Consequently, a variant sentence is
appropriate to account for the dismissed charges, as the
parties themselves recognized when they recommended a
sentence of 300 months of imprisonment for Count Two.

The high crime rate in Puerto Rico, however,
further underscores the inadequacy of the sentence

recommended by the parties. The onslaught of criminal
activity in San Juan and throughout this jurisdiction is an
appropriate sentencing consideration, a factor that promotes
general and specific deterrence. The First Circuit Court of
Appeals has, however, set forth shifting standards regarding
the propriety of community-based considerations.

In United States versus Flores-Machicote, the
district court imposed an upwardly variant sentence based in
part on Puerto Rico's escalating murder rate. In fact, the
district court emphasizes that, quote, "We (i.e., Puerto
Rico) "have the highest murder statistics in the whole
United States," unquote. The parties there recommended a
33-month term of imprisonment. The district court
determined that this recommendation was, quote,
"irresponsible," however, imposing a five-year term of
imprisonment. That sentence constituted a 19-month upward
variance.

The First Circuit Court of Appeals affirmed the
variant sentence, holding that, "The incidence of particular
crimes in the relevant community appropriately informs and
contextualizes the relevant need for deterrence." In the
Flores-Machicote opinion, the Court of Appeals set forth the
following example: "If a community is relatively free from
violent crime, a sentencing judge reasonably may deem a
violent crime aberrational and, thus, see no need for a

heightened level of deterrence.  If, however, violent crime
is running rampant, the judge reasonably may conclude that
the need for deterrence is great, and this may translate
into a stiffer sentence."

        After Flores-Machicote, the First Circuit Court of
Appeals continues to endorse community-based considerations
in the sentencing context.  For instance, in United States
versus Narvaez-Soto, the Court of Appeals emphasized that,
quote, "The district court's reasoned determination
predicated on its experience that the incidence of violent
crime and particularly gun-related violent crime is an acute
problem in Puerto Rico."  Moreover, in United States versus
Viloria-Sepulveda, the Court of Appeals recognized that,
quote, "Puerto Rico is a hot spot for weapons."

        Other jurisdictions have adopted this approach.
For example, the Seventh Circuit Court of Appeals affirmed
the imposition of an upwardly variant sentence in United
States versus Hatch, citing the district court's concerns
pertaining to the rise in Chicago's gun violence and the
flow of guns from Indiana.

        Citing the abysmal crime rate in Puerto Rico is
not, however, sufficient by itself to trigger a presumption
of reasonableness for an upward variance.  In United States
versus Rivera-Berrios, the district court imposed an upward
variant sentence based, in part, on the pervasiveness of

violent crime, murder, and machine guns in Puerto Rico.

The First Circuit Court of Appeals vacated the sentence,

however, describing the punishment imposed as, quote,

"unmoored from any individual characteristics of either the

offender or the offense of conviction."  District courts are

required to establish a case-specific nexus between the

offense of conviction (possession of illicit firearms) and

the community-based consideration (a high rate of violent

crime).

The First Circuit Court of Appeals recently placed

additional constraints on the district court's discretion,

restricting consideration of community-based considerations

in the Section 3553(a) analysis.  In United States versus

Flores-Gonzalez, for example, the Court of Appeals held

that, quote, "Sentencers cannot rely exclusively on

community characteristics in varying upward from the

guidelines," unquote.  Pursuant to this logic, district

courts cannot consider high rates of violent crime in the

relevant locality without attaching this concern to another

sentencing factor.

Judge William Kayatta concurred with the majority

in Flores-Gonzalez, but only because authoritative

precedent -- meaning, I think, Rivera-Berrios -- precluded

the First Circuit Court of Appeals from affirming what would

otherwise seem to be a poorly-justified upward variance

aimed at deterring an offense more serious than the mine-run version precisely because of the increased threats faced by a community in which it occurred.

Judge Kayatta's concurrence found it, quote, "difficult to see how Flores-Machicote gave a full-throated endorsement for the ability to enhance a sentence when the sentencing judge concludes that violent crime is running rampant in a particular community, while Rivera-Berrios and its progeny held that a judge cannot rely on that perceived need for greater deterrence to justify an upwardly variant sentence," unquote.

According to Judge Kayatta, the majority in Flores-Gonzalez, quote, "does not explain how a factor can add months to a sentence when added to other factors that themselves support an enhancement, yet support no enhancement at all on its own," unquote. Judge Kayatta stated that the Court of Appeals, quote, "has flip-flopped along the way and has likely landed wrong side up," unquote, in the Flores-Gonzalez case.

The First Circuit Court of Appeals subsequently withdrew the Flores-Gonzalez disposition, granting the United States' petition for an en banc review. Oral argument occurred nearly a year ago, but an opinion has yet to issue. This Court must pronounce sentence in the shadow of United States versus Flores-Gonzalez, tailoring a

1    reasonable term of imprisonment while the First Circuit

2    Court of Appeals attempts to reconcile inconsistent

3    precedent.

4          On March 15, 2023, the probation officer requested

5    that Mr. Flores-Gonzalez be arrested and that his supervised

6    release term be revoked because he was involved in a

7    domestic violence altercation armed with a firearm, for

8    which he would be charged by the Commonwealth authorities.

9    He fled the scene, remains at large, would be charged in

10    absentia by the Commonwealth, and an arrest warrant was

11    issued by this court.

12          Puerto Rico falls within the First Circuit, which

13    includes Maine, Rhode Island, Massachusetts, and

14    New Hampshire.  The disparity in violent crime between

15    Puerto Rico and these New England states is both astounding

16    and tragic.  From 2016 to 2018, the year Mr. Flores murdered

17    WGE, the Puerto Rico homicide rates per 100,000 inhabitants

18    were 20, 19.7, and 20 respectively.  The corresponding rates

19    of homicide in Maine, Rhode Island, Massachusetts, and

20    New Hampshire ranged from 1.8 to 2.6 per 100,000

21    inhabitants.

22          The number of murders among the First Circuit

23    jurisdictions further demonstrates that the need to deter

24    violent crime is greater in Puerto Rico than, for example,

25    in Rhode Island and even Massachusetts.  In 2015, there were

25 murders in Maine, 31 in Rhode Island, 131 in

Massachusetts, 15 in New Hampshire, and 614 in Puerto Rico.

In 2016, there were 16 murders in Maine, 29 in Rhode Island,

134 in Massachusetts, 17 in New Hampshire, and 704 in Puerto

Rico.  In 2017, there were 21 murders in Maine, 21 in Rhode

Island, 172 in Massachusetts, 13 in New Hampshire, and 729

in Puerto Rico.  In 2018, there were 19 murders in Maine, 16

in Rhode Island, 138 in Massachusetts, 21 in New Hampshire,

and 641 in Puerto Rico.  This data derives from the Centers

For Disease Control and Prevention and the Puerto Rico

Statistics Institute.

       This Court cannot, however, consider the high

crime rate in Puerto Rico without establishing a

case-specific nexus to this criminal action.  This case

represents a confluence of crime that regrettably is common

in Puerto Rico.  The defendants abducted WGE in stolen

vehicles.  Mr. Flores and others kidnapped WGE by

threatening to shoot him, and drove him to a remote

location.  Mr. Flores then murdered WGE to eliminate a rival

gang member.

       Mr. Flores got out of the vehicle and shot WGE in

the head with a .38 caliber revolver he had been previously

given by the others when WGE was kidnapped.  A cooperating

witness alleged that Defendant Melendez and another

co-defendant gave a revolver to a person who first shot WGE.

1     That person was Mr. Flores. When he received the revolver,

2     he knew at that moment that he was the person selected to

3     kill WGE.

4           According to Defendant Luyando, Mr. Flores

5     participated in obliterating WGE's face with bullets from

6     the revolver. He then destroyed evidence by burning the

7     Toyota Camry with Mr. Melendez-Hiraldo. This killing was

8     calculated and instilled fear in WGE until the moment of his

9     death. The ominous drive from the public housing project in

10    a car with his armed assailants ensured that WGE's final

11    moments on earth were filled with panic and anxiety. The

12    violent killing of WGE accounts for just one of the 641

13    murders that occurred in Puerto Rico in 2018. This Court

14    will not view WGE as a number, losing sight of the gravity

15    of this offense. The statistics aid the Court in providing

16    context, however, highlighting the need for general and

17    specific deterrence in an island plagued by crime.

18          The parties recommend a sentence of 300 months of

19    imprisonment as to Count Two. The Court finds that the

20    sentence recommended by the parties does not reflect the

21    seriousness of the offense, does not promote respect for the

22    law, does not protect the public from additional crimes by

23    Mr. Flores, and does not address the issues of deterrence

24    and punishment.

25          Accordingly, it's the judgment of the Court that

1     Jadnel Flores-Nater is committed to the custody of the

2     United States Bureau of Prisons to be imprisoned for a term

3     of 360 months.

4           Upon release from confinement, Mr. Flores shall be

5     placed on supervised release for a term of five years, to be

6     served under the terms and conditions imposed on him on

7     October 7, 2021.

8           Having considered Mr. Flores's financial

9     condition, a fine is not imposed.  A special monetary

10    assessment in the amount of $100 is imposed, however, as

11    required by law.

12          Mr. Flores, you have entered into a plea agreement

13    in which you waived your right to appeal your conviction and

14    sentence.  That waiver is enforceable, but if your waiver is

15    not enforceable, you may present that argument to the

16    Appellate Court.  A notice of appeal must be filed in this

17    court within 14 days of when the judgment will be entered.

18    If you are unable to pay the cost of an appeal, you may

19    apply for leave to appeal as an indigent.  If you request

20    it, the Clerk of the Court will prepare and file a notice of

21    appeal on your behalf.

22          Mr. Gonzalez, would you like me to recommend that

23    Mr. Flores be remanded to the same institution that he was

24    in before?

25          MR. GONZALEZ:  Yes, Your Honor.

```
1              THE COURT:  Which is what?

2              MR. GONZALEZ:  It's McDowell Correctional Facility

3     in West Virginia.

4              THE COURT:  I will recommend -- is it McDowell?

5              MR. GONZALEZ:  Yes.

6              THE COURT:  I will recommend that Mr. Flores be

7     again designated to McDowell Correctional Facilities in

8     West Virginia, also that he continue taking vocational

9     training, that he participate in psychiatric treatment, and

10    that he take courses in English as a second language.

11             Anything else?

12             MR. GONZALEZ:  That would be all, Your Honor.

13             THE COURT:  Mr. Acevedo?

14             MR. ACEVEDO:  Nothing from the United States.

15             THE COURT:  You are excused.

16             MR. ACEVEDO:  Thank you, Your Honor.

17             (PROCEEDINGS ADJOURNED AT 11:35 A.M.)

18

19

20

21

22

23

24

25
```

Add. 24

1   UNITED STATES DISTRICT COURT )
                                 )   ss.
2   OF PUERTO RICO               )

3

4

5                         **REPORTER'S CERTIFICATE**

6

7

8           I, LISA O'BRIEN, do hereby certify that the above

9   and foregoing, consisting of the preceding 24 pages,

10  constitutes a true and accurate transcript of my

11  stenographic notes and is a true and complete transcript of

12  the proceedings to the best of my ability.

13          Dated this 16th day of February, 2024.

14

15                          ___S/Lisa O'Brien_____
                            Lisa O'Brien
16                          USDC Court Reporter
                            708-284-0021
17

18

19

20

21

22

23

24

25

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

District of Puerto Rico

| UNITED STATES OF AMERICA | **AMENDED JUDGMENT IN A CRIMINAL CASE** |
|---|---|
| **v.** | |
| Jadnel Flores-Nater (6) | Case Number:  3:18-cr-00516-FAB |
| | USM Number:  54111-069 |
| **Date of Original Judgment:**   10/7/2021 | Jason Gonzalez, Esq. |
| *(Or Date of Last Amended Judgment)* | Defendant's Attorney |

**THE DEFENDANT:**

☑ pleaded guilty to count(s)    Count Two (2) of the Second Superseding Indictment on June 24, 2021.

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☐ was found guilty on count(s)
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18:924(c)(1)(A)(iii) & 18:2 | Knowingly carry, use, brandish, and discharge one or more firearms during and in relation to the kidnapping resulting in the death of WGE | 7/8/2018 | Two (2) |

The defendant is sentenced as provided in pages 2 through ____7____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☑ Count(s)   Remaining                    ☐ is   ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

10/11/2023
Date of Imposition of Judgment

S/ Francisco A. Besosa
Signature of Judge

Francisco A. Besosa,          Senior U.S. District Judge
Name and Title of Judge

10/11/2023
Date

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 2 — Imprisonment                                            (NOTE: Identify Changes with Asterisks (*))

Case 3:18-cr-00516-FAB   Document 442   Filed 10/11/23   Page 2 of 7

Judgment — Page   2   of   7

DEFENDANT:   Jadnel Flores-Nater (6)
CASE NUMBER:   3:18-cr-00516-FAB

## IMPRISONMENT

      The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of :
Three-hundred and sixty (360) months.

☑    The court makes the following recommendations to the Bureau of Prisons:
      The the defendant be provided vocational training, psychiatric treatment, English as a second language and, that he is remanded to serve his sentence in FCI McDowell, West Virginia.

☑    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district:

    ☐   at  _____  ☐ a.m.  ☐ p.m.  on  _____ .

    ☐   as notified by the United States Marshal.

☐    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐   before 2 p.m. on  _____ .

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on  _____  to  _____

at  _____  with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By  _____
DEPUTY UNITED STATES MARSHAL

Add. 27

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 3 — Supervised Release        (NOTE: Identify Changes with Asterisks (*))

Case 3:18-cr-00516-FAB   Document 442   Filed 10/11/23   Page 3 of 7

Judgment—Page   3   of   7

DEFENDANT:   Jadnel Flores-Nater (6)
CASE NUMBER:   3:18-cr-00516-FAB

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

Five (5) years.

# MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   - ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. § 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

Add. 28

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page ___4___ of ___7___

DEFENDANT:   Jadnel Flores-Nater (6)
CASE NUMBER:   3:18-cr-00516-FAB

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.    You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.    After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.    You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.    You must answer truthfully the questions asked by your probation officer.
5.    You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.    You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.    You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.    You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.    If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.   You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.   You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.   If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13.   You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature  _____     Date  _____

Add. 29

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 3B — Supervised Release                                                      (NOTE: Identify Changes with Asterisks (*))

Case 3:18-cr-00516-FAB   Document 442   Filed 10/11/23   Page 5 of 7

Judgment—Page    5    of    7

DEFENDANT:     Jadnel Flores-Nater (6)
CASE NUMBER:   3:18-cr-00516-FAB

# ADDITIONAL SUPERVISED RELEASE TERMS

1. He shall observe the standard conditions of supervised release recommended by the United States Sentencing Commission and adopted by this Court.

2. He shall not possess any firearms, destructive devices or other dangerous weapons.

3. He shall participate in vocational training or a job placement program, as recommended by the U.S. Probation Officer.

4. He shall not use controlled substances unlawfully and shall submit to a drug test within fifteen (15) days of release from imprisonment; after his release, Mr. Flores shall submit to random drug testing, not less than three (3) samples during the supervision period, but not more than 104 samples each year, in accordance with the Drug Aftercare Program Policy of the United States Probation Office as has been approved by this Court. If the illegal use of controlled substances is detected in any sample, Mr. Flores shall participate in an inpatient or an outpatient substance abuse treatment program, for evaluation or treatment, as arranged by the Probation Officer; payment shall be based on his ability to pay or the availability of payments by third parties, as approved by the Court.

5. He shall submit himself and his property, house, residence, vehicles, papers and effects, computers and other electronic communication or data storage devices or media to a search, at any time, with or without a warrant, by the probation officer, and if necessary, with the assistance of any other law enforcement officer, but only in the lawful discharge of the supervision functions of the probation officer, who must have a reasonable suspicion of unlawful conduct or of a violation of a condition of supervised release. The probation officer may seize any electronic communication or electronic device or medium which will be subject to additional forensic investigation or analysis. Failure to present a search and seizure may be grounds for revocation of supervised release. The defendant shall warn any other resident or occupant that his premises may be subject to searches pursuant to this condition.

Add. 30

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page __6__ of ___7___

DEFENDANT:  Jadnel Flores-Nater (6)
CASE NUMBER:  3:18-cr-00516-FAB

# CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ | $ | $ | $ |

☐  The determination of restitution is deferred until _____ .  An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐  The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| **TOTALS** | $                0.00 | $                0.00 | |

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

☐  the interest requirement is waived for   ☐  fine   ☐  restitution.

☐  the interest requirement for the   ☐  fine   ☐  restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Judgment — Page __7__ of __7__

DEFENDANT:   Jadnel Flores-Nater (6)
CASE NUMBER:   3:18-cr-00516-FAB

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

**A**   ☑   Lump sum payment of $ ___100.00___ due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with   ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

**B**   ☐   Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

**C**   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of  $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of  $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E**   ☐   Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**   ☐   Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate. |
|---|---|---|---|
| | | | |

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.